UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                :

BARRY MITCHELL,                      :
                                :
                   Plaintiff,     :

                                :        MEMORANDUM
                                :        <u>AND ORDER</u>
         - against -            :
                                :

SERGEANT JOHN KUGLER,        :        07 CV 1801 (JG) (LB)
SERGEANT NELSON VILLAFANE,   :
POLICE OFFICER JAMES LEE,     :
JOHN DOE #1-5,               :
DISTRICT ATTORNEY RICHARD A. BROWN,  :
AND THE CITY OF NEW YORK,     :
                                :
                  Defendants.   :
------------------------------------------------------------ X

A P P E A R A N C E S:

       BARRY MITCHELL
           03A4319
           Five Points Correctional Facility
           PO Box 119
           Romulus, NY 14541
           Plaintiff, *pro se*

       MICHAEL A. CARDOZO
           New York City Law Department
           100 Church Street
           New York, NY 10007
       By:   Maurice L. Hudson
           Attorney for Defendants

JOHN GLEESON, United States District Judge:

      Barry Mitchell brings this *pro se* action under 42 U.S.C. § 1983 against Sergeant

John Kugler, Sergeant Nelson Villafane, Police Officer James Lee, John Doe #1-5, District

Attorney Richard A. Brown, and the City of New York. Mitchell has alleged violations of

numerous provisions of the United States Constitution, including the Fourth, Fifth, Sixth, Eighth,

and Fourteenth Amendments, and he has brought corresponding supplemental claims under New York law. Mitchell is seeking damages for false arrest, unlawful search and seizure, excessive force, and malicious prosecution. Defendants have moved for a judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth below, the motion is granted in part and denied in part. Specifically, it is denied with respect to Mitchell's claims of false arrest and malicious prosecution. As to those claims, I am converting the motion into a motion for summary judgment, and Mitchell shall have the opportunity to file a supplemental opposition to the converted motion, as discussed more fully below.

BACKGROUND

The following facts are drawn from the plaintiff's complaint, filed April 25, 2007, amended complaint, filed November 13, 2007,[1] and documents attached to the pleadings, and are assumed to be true for the purposes of this motion.

A.    *The November 8, 2002 Arrest and Charges*

On November 8, 2002, at approximately 1:30 p.m., Mitchell was walking down Elmhurst Avenue in Queens County, New York, when he was approached and surrounded by four Spanish-speaking strangers. Mitchell asked them in English what the problem was but received no answer. Afraid for his safety, Mitchell attempted to free himself from the group but was grabbed from behind and thrown to the ground by one of the individuals. Mitchell told them that he did not do anything wrong.[2] After approximately five minutes of sitting on the ground,

---

[1]    Mitchell's amended complaint differed from the original complaint only insofar as it corrected the spelling of defendant Kugler's name and included only those paragraphs from the original complaint that mentioned Kugler.

[2]    At oral argument on November 6, 2008, defense counsel argued that Mitchell was hardly selected at random by the four men. Rather, one of Mitchell's victims, LD, had been walking down the street when she identified Mitchell to the friends she was with as the man who had tried to rape her two days earlier. The friends called 9-1-1 and detained Mitchell until the police arrived on the scene, when LD herself told the police that Mitchell had tried to rape her. This version of events is confirmed by the minutes of the grand jury proceedings, which have been provided to the Court by defense counsel. Defense counsel is respectfully instructed to send a

Mitchell was approached by defendants Kugler and John Doe #4, who had arrived to the scene in an unmarked patrol car. Kugler and John Doe #4 handcuffed and arrested Mitchell. They then put him in the unmarked patrol car and returned to the group that had detained him to speak with them. Approximately ten minutes later, Kugler and John Doe #3 moved Mitchell to a marked patrol car. When Mitchell inquired as to the reason for his arrest, John Doe #3 told him that "he would find out at the station house." Defendant Villafane then drove Mitchell to the precinct, where he was searched and locked in a holding cell.

Over the next twenty minutes, Villafane questioned Mitchell about his age, height and weight, fingerprinted him, and transferred him to a different cell before ultimately moving him to an interrogation room. John Doe #2 and Villafane then questioned Mitchell about a burglary. When Mitchell responded that he had nothing to say, John Doe #2 became angry and handcuffed Mitchell to a metal pipe against the wall and left the room with Villafane. In pain from the handcuffs, Mitchell yelled to the officers, who uncuffed him after approximately 25 minutes.

Some time later, Villafane and Kugler resumed questioning Mitchell. When asked why he was in the neighborhood in which he was arrested, Mitchell said that he was visiting a friend. Villafane and Kugler offered to help Mitchell if he would cooperate. Again, Mitchell told them that he had nothing to say but this time he also asked for a lawyer. Before leaving the room, Kugler told Mitchell that he knew he had been in the neighborhood the day of the crime, and that he could prove Mitchell was a liar.

Mitchell was returned to a holding cell and then photographed by Villafane for a photo array for an unrelated crime. When Mitchell asked again why he was under arrest,

copy of those minutes (redacting only the names of the two complainants) to the plaintiff together with a copy of the transcript of his first trial ("Trial Tr.").

Villafane told him that he did not know. Mitchell was then approached by another officer, John Doe #5, who wanted to speak with him, but Mitchell refused. Fifteen minutes later, Mitchell was moved back to the interrogation room, where an oral swab to collect DNA was administered to him. After waiting another hour in a holding cell, Villafane told Mitchell that he would probably be charged with burglary. Sometime later that evening, Mitchell was taken to central booking, where he was fingerprinted, photographed and subjected to other arrest processing.

The next day, November 9, 2002, Mitchell was arraigned and charged with burglary in the second degree and harassment in the second degree. Mitchell pled not guilty and was remanded to Rikers Island.

The grand jury indicted Mitchell for two counts of burglary in the first degree[3] -- each pertaining to a different victim -- on December 10, 2002, to which Mitchell pled not guilty on January 6, 2003. The first victim, LD, had reported to the police on November 6, 2002 that at approximately 1:30 PM that day, a man standing behind her in an elevator at 40-050 Denman Street grabbed her neck with his left arm and covered her mouth with his right hand. The perpetrator directed her to get out on the third floor because they were "going to do something." When the elevator opened, LD started to scream and the perpetrator fled via a stairway. The second victim, MR, had reported that at approximately 4:15 PM on November 6, 2002, she was similarly attacked in an elevator at 99-004 57th Avenue, by a man who pushed her against the wall, told her that he had a gun, and directed her to get out on the third floor. As with LD, when the elevator door opened and MR started screaming, the perpetrator fled via the stairs.

During the grand jury proceedings, LD described the perpetrator as having "black dark skin, freckles," and as being "a little chubby." Mitchell's January 17, 2003 motion to

---

[3]     Mitchell's complaint states that he was indicted for burglary in the first degree and burglary in the second degree. It appears from the state court opinion reversing his conviction after the first trial, however, that he was charged with two counts of first degree burglary. *People v. Mitchell*, 789 N.Y.S.2d 185, 186 (2d Dep't 2005).

dismiss and for a review of the grand jury minutes for insufficiency of the evidence before the grand jury was denied.

B.    *Mitchell's First Criminal Trial*

Mitchell's trial commenced on June 2, 2003.  LD first testified on direct examination that she did not see the perpetrator in the courtroom.  In response to a follow-up question by the trial judge, she then said that Mitchell "look[ed] like" the person who accosted her, that Mitchell was "like that color, yes, he looks like him," and that "it seems to me that yes, it's him.  His way of looking, his look."  Trial Tr. 44-45.  After a sidebar, the ADA was permitted to continue to question LD until she testified that Mitchell was her attacker by pointing to him in the courtroom.  Trial Tr. 50.  On cross-examination, defense counsel challenged the identification by repeatedly asking LD whether she had described her attacker to the police as being a 28 year-old "Hispanic white man."  Trial Tr. 92-93.  Mitchell himself is dark-skinned, and he was 44 years old at the time of trial.

At the conclusion of LD's testimony, the ADA produced a handwritten police complaint report setting forth LD's post-crime description of the perpetrator.  The description in this new report differed significantly from the one set forth in the typed complaint report that was turned over to Mitchell before trial.  Specifically, during a pretrial *Wade* hearing (*see United States v. Wade*, 388 U.S. 218 (1967)), the prosecutor had disclosed to Mitchell's counsel copies of a typed report that stated that LD had described the perpetrator as a 28-year-old Hispanic/white male, who was 5'11'', 160 pounds, and wearing a grey jacket and blue jeans. The report that was disclosed for the first time at trial was the handwritten "worksheet" from which the previously-disclosed report was created (defense counsel described it at trial as the "scratch copy" of the typewritten report, *see* Trial Tr. 135).  It contained more details of the

description provided by LD, including the critical fact that the perpetrator had "dark skin" and also that he was wearing a hat. It was used to rehabilitate LD's testimony identifying Mitchell. *See, e.g.*, Trial Tr. 347 (noting that handwritten report said LD described perpetrator as dark-skinned). After defense challenged the belated disclosure of the handwritten report, the trial judge determined that although the prosecutor had committed a *Rosario* violation (*see People v. Rosario*, 173 N.E.2d 881 (1961)), a mistrial was not warranted; accordingly, a curative instruction was given to the jury regarding the *Rosario* violation instead.

The jury found Mitchell guilty of two counts of burglary in the first degree. On August 1, 2003, Mitchell was sentenced to 25 years to life. Mitchell appealed, and on January 18, 2005, the Appellate Division, Second Department, reversed his convictions and ordered a new trial. *People v. Mitchell*, 789 N.Y.S.2d 185 (2d Dep't 2005). It held that the trial court had abused its discretion by declining to grant a mistrial when the handwritten report was produced for the first time at trial. In ordering a new trial, the court explained, "As the defendant framed the issue entirely in terms of the misidentification shown by the documents in his possession, and cross-examined the first witness without the benefit of the missing documents, he was substantially prejudiced by the violation." *Id.* at 186.[4]

C.      *Mitchell's Second Criminal Trial*

Mitchell's new trial began December 6, 2005. LD was not permitted to testify by the trial judge.[5] On January 31, 2006, Mitchell was found guilty of burglary in the first degree in connection with the November 6, 2002 assault of MR, and sentenced as a persistent violent

---

[4]      The Appellate Division's opinion states that the prosecution "turned over copies of additional police *reports* containing different descriptions of the perpetrator, which were much closer to that of [Mitchell]." *Id.* at 186 (emphasis added). From the record before me, however, it appears that only one new report was produced at trial.

[5]      In the minutes from Mitchell's sentencing on January 31, 2006, the judge stated, "The jury in this case only heard one of the two complainants. I would not permit the district attorney to put the other one on because of the legal issues that arose." Notice of Motion, Ex. F at 121.

felony offender to 25 years to life in prison. The New York Appellate Division, Second

Department affirmed the conviction on January 29, 2008, *People v. Mitchell*, 849 N.Y.S.2d 445,

445 (2d Dep't 2008), finding that the hearing court properly declined to suppress identification

testimony because "the photo array that was shown to [MR] was not unduly suggestive, as the

individuals in the photo array were sufficiently similar in appearance to [Mitchell]." On May 12,

2008, the New York Court of Appeals denied Mitchell leave to appeal. *People v. Mitchell*, 890

N.E.2d 256 (2008).

D.      *The Instant Action*

On April 25, 2007, Mitchell filed his *pro se* complaint, a request to proceed *in

forma pauperis* and a motion to appoint counsel. On May 4, 2007, I granted his request for *in

forma pauperis* status and denied without prejudice his motion to appoint counsel because

Mitchell had not demonstrated "likely merit," as required under *Cooper v. A. Sargenti Co., Inc.*,

877 F.2d 170, 174 (2d Cir. 1989). On August 3, 2007, I granted the defendants' motion to stay

the action until the resolution of Mitchell's appeal of his conviction. On August 29, 2007, I

denied Mitchell's application for reconsideration of my August 3, 2007 stay.

On March 26, 2008, I lifted the stay following the New York Court of Appeals'

denial of Mitchell's request for leave to appeal. Defendants answered Mitchell's amended

complaint on May 16, 2008.

On July 17, 2008, I granted defendants' request to stay discovery pending the

resolution of this motion for judgment on the pleadings, which defendants ultimately filed on

September 5, 2008. Oral argument, in which Mitchell appeared via video-conference, was held

before me on November 6, 2008.

DISCUSSION

A.      *Claims Properly Resolved Under Rule 12(c)*

1.      *Standard of Review*

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c).  In deciding a Rule 12(c) motion, a court applies the same standard that applies to a motion under Rule 12(b)(6).  *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999) ("In deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6)….").  Motions to dismiss pursuant to Rule 12(b)(6) test the legal, not the factual, sufficiency of a complaint.  *See, e.g.*, *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998))).  Accordingly, I must accept the factual allegations in the complaint as true, *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam), and draw all reasonable inferences in favor of the plaintiff.  *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995).  However, I do not give effect to "legal conclusions couched as factual allegations."  *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)).

The plaintiff is not entitled to unlimited favorable inferences at the motion to dismiss stage, however.  The Supreme Court has held that the standard governing a complaint's legal sufficiency is in part one of "plausibility," *id.* at 1968, no longer governed by the "no set of facts" admonition of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  The new plausibility standard "obliges a pleader to amplify a claim with some factual allegations in those contexts

where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (italics omitted) (interpreting *Twombly*). The Second Circuit's subsequent decision in *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008), however, strongly suggests that *Twombly* does not significantly alter the lenient, notice-focused standard used to assess the complaint of a *pro se* litigant. *Id.* at 213-14. *Boykin* noted that after *Twombly*, the Supreme Court's decision in *Erickson*, 127 S.Ct. 2197, which addressed the sufficiency of a pleading under Rule 8(a) filed by a *pro se* plaintiff, explained that "'[s]pecific facts are not necessary,' and that the complainant 'need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 214 (quoting *Erickson*, 127 S.Ct. at 2200 (internal quotation marks omitted) (alteration in original)). *Boykin* also focused on *Erickson*'s rationale for finding that "departure from Rule 8(a)'s liberal pleading standard was particularly unwarranted" where the complaint was filed *pro se*: "'A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id.* (quoting *Erickson*, 124 S.Ct. at 2200).

When considering a motion to dismiss, a court may examine (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as exhibits or incorporated in it by reference; (3) matters of which judicial notice may be taken; or (4) documents either in the plaintiff's possession or of which the plaintiff had knowledge and relied on in bringing suit. *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

2. *Mitchell's Excessive Force Claim*

The argument that a plaintiff's claims are barred by the applicable statute of limitations is an affirmative defense that should be raised in a defendant's answer. Fed. R. Civ. P. 8(c). Generally, the failure to plead an affirmative defense results in a waiver of that defense.

*See Travellers Intern., A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994). However, courts have the discretion to entertain an affirmative defense that is first raised in a post-answer motion by construing the motion as one to amend the pleadings under Rule 15(a). *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350-51 (2d Cir. 2003); *Block v. First Blood Associates*, 988 F.2d 344, 350-51 (2d Cir. 1993) (district court did not abuse its discretion where it construed defendants' motion for summary judgment as motion to amend answer to include statute of limitations defense).  Rule 15(a) provides that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a); *see Foman v. Davis*, 371 U.S. 178, 182 (1962); *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994).  Absent evidence of "undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility, Rule 15's mandate must be obeyed." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000).  Because the record in this case does not support a finding of undue delay, bad faith or dilatory motive on the part of the movants in their failure to raise the statute of limitations defense, I construe defendants' motion as one to amend the pleadings to include the affirmative defense that the excessive force claim has not been brought within the applicable statute of limitations.  I further conclude that leave to amend should be granted.[6]

---

[6]     The defendants explained that counsel assigned to this case changed numerous times between the date the action was stayed and the date the stay was lifted seven months later.  Defs.' Br. 7.  While that explanation suggests a measure of disorganization, it does not evidence bad faith or intentional delay.  Moreover, Mitchell is not prejudiced by my decision to construe defendants' motion as one to amend their answer.  "A court will find 'prejudice' when a new claim against a party would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'" *Amaya v. Garden City Irrigation, Inc.*, 2008 WL 4181555, at *1, n.2 (E.D.N.Y. 2008) (quoting *Monahan v. New York City Dep't of Corr.*, 214 F.3d at 284 (citation omitted)).  None of the relevant bases for prejudice are present in this case.  Permitting a statute of limitations defense will not require Mitchell to expend additional resources, delay the resolution of the case, or prevent him from bringing a timely action in another jurisdiction.

A claim under 42 U.S.C. § 1983 is subject to the default statute of limitations applicable to personal injury actions in the state in which the claim is filed, which is three years in New York. *Owens v. Okure*, 488 U.S. 235, 236, 251 (1989). The tolling provisions for a state's statute of limitations are borrowed along with the statute itself. *See Board of Regents v. Tomanio*, 446 U.S. 478, 483 (1980) (adopting the view that the New York federal courts considering the plaintiff's § 1983 claim are "obligated not only to apply the analogous New York statute of limitations to [the plaintiff's] federal constitutional claims, but also to apply the New York rule for tolling that statute of limitations"); *see also, e.g.*, *Woods v. Candela*, 13 F.3d 574, 576 (2d Cir.) ("New York's tolling provisions govern the tolling of the statute of limitations."), *vacated on other grounds*, 513 U.S. 801 (1994).

Additionally, equitable tolling is available in "rare and exceptional" cases where "extraordinary circumstances prevented a party from timely performing a required act," and "the party acted with reasonable diligence throughout the period" to be tolled. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (internal quotation marks omitted); *see also Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (noting that New York law authorizes the use of the equitable estoppel doctrine to toll a statute of limitations "'when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action'" (quoting *Doe v. Holy See (State of Vatican City)*, 793 N.Y.S.2d 565, 568 (3d Dep't 2005))). The plaintiff bears the burden of establishing equitable tolling. *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000).

As noted above, the statute of limitations for § 1983 claims is three years. A claim for excessive force accrues when the use of force occurred. *See, e.g.*, *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980), *cert. denied*, 450 U.S. 920 (1981). Mitchell's excessive force claim -- based on being handcuffed to a pipe in the interrogation room -- accrued

on the day of the arrest, November 8, 2002.  Because Mitchell filed this action on April 25, 2007, well over three years later, this claim is time-barred unless he can show that he is entitled to either statutory or equitable tolling.  *See Owens*, 488 U.S. at 251 (affirming application of three-year statute of limitations to § 1983 action filed in New York).  There are no circumstances that would warrant equitable or statutory tolling in this case.  Mitchell's excessive force claim is therefore dismissed as time-barred.

      3.    *Mitchell's State Law Claims*

New York law requires that an individual file a timely notice of claim within 90 days of its accrual as a precondition to commencing any action for damages against the City of New York or its employees.  *See* N.Y. Gen. Munic. Law §§ 50-e, 50-i.[7]  The purpose of this statutory pre-condition to suit is to "afford the municipality an adequate opportunity to investigate the claim in a timely and efficient manner and, where appropriate, to settle claims without the expense and risks of litigation."  *Fincher v. County of Westchester*, 979 F. Supp. 989, 1002 (S.D.N.Y. 1997) (citations omitted).  In addition, notice of claim requirements apply no less forcefully to state tort claims brought as supplemental claims in a federal civil rights action. *Id.*  Failure to comply with this provision requires dismissal.  *See Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 428 (S.D.N.Y. 2002) (dismissing state law claims in a federal civil rights action against a city and its police officers when plaintiff failed to file a timely notice of claim); *Steiner v. City of New York*, 920 F. Supp. 333, 342 (E.D.N.Y. 1996).

---

[7]    N.Y. Gen. Munic. Law § 50-i states in pertinent part:
No action or special proceeding shall be prosecuted or maintained against a city … for personal injury … alleged to have been sustained by reason of the negligence or wrongful act of such city … or of any officer, agent or employee thereof, … unless, (a) a notice of claim shall have been made and served upon the city … in compliance with section fifty-e of this chapter.
*Id.*

In order for Mitchell's state tort claims to proceed here, he needed to have filed a notice of claim within 90 days of the accrual of his claims. Mitchell failed to plead that he served a notice of claim as required. In addition, the defendants claim that they have received none and Mitchell does not argue otherwise. In fact, Mitchell failed to address this issue at all in his opposition to the defendants' motion. Accordingly, Mitchell's state law claims are dismissed.

4. *Mitchell's Claims Against District Attorney Richard A. Brown*

Defendant Richard A. Brown is absolutely immune to a suit such as this one. *See Imbler v. Pachtman*, 424 U.S. 409, 430 (1976) (prosecutors absolutely immune from suit for damages arising from actions "intimately associated with the judicial phase of the criminal process"). Such activities include the initiation of prosecution and the presentation of the government's case. *See Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987) (citing *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981)). Claims against defendant Brown are accordingly dismissed.

5. *Mitchell's Fourth Amendment Claim*

Mitchell asserts a Fourth Amendment unreasonable search claim based on his allegation that his DNA was collected via an oral swab while he was in police custody on November 8, 2002. The Fourth Amendment guarantees the right to be free from unreasonable searches. Although DNA swabs may be considered searches, *see Nicholas v. Goord*, 430 F.3d 652, 656 n.5 (2d Cir. 2005) (noting that cheek swabs "can constitute a search, since '[t]he ensuing chemical analysis of the sample' may also effect an 'invasion of the [searchee's] privacy interests'" (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989))), under certain circumstances they are permitted, even without a warrant, *Nicholas*, 430 F.3d 652

(upholding the constitutionality of New York state's DNA collection statute under the "special needs" exception).

Regardless of whether the search was unreasonable in this case, the defendants are entitled to qualified immunity. "Qualified immunity shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) (internal quotation marks omitted). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Previously, under *Saucier v. Katz*, 533 U.S. 194 (2001), a two-step inquiry into whether a suit against officers was barred by qualified immunity required the court to, first, "determine whether the facts, taken in the light most favorable to the party asserting an injury, show a violation of a constitutional right" and second, to "determine whether the constitutional right was 'clearly established' such that '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Holeman*, 425 F.3d at 189 (quoting *Saucier*, 533 U.S. at 201-06) (alterations in original). However, the Supreme Court recently held in *Pearson v. Callahan*, 555 U.S. ___, No. 07-751, 2009 WL 128768, at *3 (Jan. 21, 2009), that "the *Saucier* procedure should not be regarded as an inflexible requirement" and concluded that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Id*. at *3, *9-10 (noting that while "there are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong … the [*Saucier*] procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case" such as "cases in

which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right").

In keeping with the Supreme Court's decision to permit district courts to exercise their discretion in determining "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand," I conclude that even construing the alleged facts of this case in the light most favorable to Mitchell, the officers are entitled to qualified immunity because no violation of a clearly established constitutional right exists. *Id*. at *9. Given (1) the specific circumstances of Mitchell's arrest, *i.e*., LD identified Mitchell as the man who tried to rape her, and LD's complaint listed Mitchell's offense as attempted sexual abuse; and (2) Mitchell's status as a risk level 3 registrant (the highest level) on the New York Sex Offender Registration Act ("SORA")[8] Registry, it is not clear that a reasonable police officer would consider taking a DNA swab to be an act in violation of Mitchell's Fourth Amendment rights. I therefore dismiss the claim based on qualified immunity.

B.      *Claims Not Resolved Under Rule 12(c)*

1.      *Mitchell's False Arrest and Malicious Prosecution Claims*

The only problem with the defendants' motion to dismiss the false arrest and malicious prosecution claims is procedural. They correctly argue that both claims may be defeated by a showing that the arrest and prosecution were supported by probable cause. *See*

---

[8]      I take judicial notice of the fact that Mitchell is a SORA registrant. *See* Notice of Motion, Ex. E. The New York Sex Offender Registration Act ("SORA"), N.Y. Corr. Law §§ 168 *et seq*. (McKinney 1996), established the state Sex Offender Registry. *See United States v. Polizzi*, 549 F. Supp. 2d 308, 367 (E.D.N.Y. 2008) ("SORA was enacted to assist local law enforcement agencies and to protect communities by: 1) requiring sex offenders to register with the State, and, 2) providing information to the public about certain sex offenders living in their communities. Persons convicted of specific federal crimes, … must register with New York State."); *see also* N.Y. Corr. Law § 168-a(2)(d); § 168-b (listing types of registration information required); § 168-f.

*Dukes v. City of New York*, 879 F. Supp. 335, 340-42 (S.D.N.Y. 1995).  However, they inexplicably rely solely on Mitchell's pleadings in arguing that probable cause was present, and those pleadings do not bear the weight.  As described above, Mitchell alleges that he was wrestled to the ground by four civilians, and that five minutes later he was arrested, despite having done nothing wrong.  Rather than submit evidence that Mitchell was detained by the civilians and lawfully arrested by the police *because LD identified him at the scene as having tried to rape her two days earlier*, the defendants assert only that it "strains credulity" to believe something like that did *not* happen.  Defs.' Br. 12.  I disagree that a judgment on the pleadings can be so easily obtained.  Mitchell alleged that he was arrested and then prosecuted without anyone providing the police with information that he had committed a crime.  Though the defendants argue that more is required to "nudge the claim across the line from conceivable to plausible as contemplated in *Iqbal* [490 F.3d at 157-58]," it is difficult to imagine what that might be.  Defs.' Br. 12.

I assume the defendants' reliance solely on the plaintiff's pleading was a tactical choice motivated by the procedural vehicle for the motion.  In fact, the grand jury testimony produced at my instruction clearly establishes probable cause for the challenged arrest and prosecution.  "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).  There was no reason here for the arresting officers to doubt LD's veracity, and thus they were authorized to arrest Mitchell.  Indeed, under the circumstances, it would have been irresponsible of them to let him go.  Moreover, the validity of the arrest does not depend on a subsequent finding of guilt.  *Pierson v.*

*Ray*, 386 U.S. 547, 555 (1967).

I have also reviewed the transcript of the first trial with an eye toward the possibility that Mitchell might pursue a claim of false arrest or malicious prosecution despite the existence of probable cause based on his allegations that the hand-written report was fabricated. The viability of pursuing such a claim would arise under the Second Circuit's holdings in *Ricciuti v. N.Y. City Transit Authority*, 124 F.3d 123 (2d Cir. 1997) and *Jocks v. Tavernier*, 316 F.3d 128 (2d Cir. 2003). In *Ricciuti*, the plaintiffs in a § 1983 action argued that summary judgment for the defendants was improperly granted because genuine issues of fact remained with respect to their allegation that individual defendants knowingly fabricated and distributed a false confession to prosecutors. The defendants argued that because they had probable cause to arrest, the plaintiffs had "no claim for post-arrest fabrication of evidence against them." *Ricciuti*, 124 F.3d at 130. The Second Circuit disagreed:

> This argument-an ill-conceived attempt to erect a legal barricade to shield police officials from liability-is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society. No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. … When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.

*Id.*; *see also Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."). The *Ricciuti* court appeared to treat *as an independent constitutional*

*tort* the claim that fabrication of evidence denied plaintiffs a fair trial; it went on to analyze a malicious prosecution claim separately by stating the traditional rule that probable cause is a complete defense. *Ricciuti*, 124 F.3d at 130-131. However, in *Jocks*, 316 F.3d 128, the Second Circuit steered the rationale of *Ricciuti* into the malicious prosecution cause of action. Indeed, *Jocks* characterized the above-quoted discussion from *Ricciuti* as a ruling on a malicious prosecution claim:

> [T]he trial court, in dismissing the malicious prosecution claim against Oggeri, rejected the argument that the fabrication of evidence is a civil rights violation. In so doing, the district court erred. We have held that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130. Oggeri asserts that *Ricciuti* only applies to false evidence created to justify an arrest without probable cause, but in *Ricciuti* we specifically held that the police had probable cause to arrest but nonetheless reversed the district court's grant of summary judgment on the malicious prosecution claim because there was proof that the officers had later manufactured false evidence. *Id*. at 128, 130.

316 F.3d at 138. *Jocks*, reading *Ricciuti*, thus seems to stand for the proposition that on a malicious prosecution claim, if it can be proved that a law-enforcement officer fabricated material evidence against a suspect and forwarded it to prosecutors, causing the suspect to be deprived of his liberty, *see Ricciuti*, 124 F.3d at 130 (noting that recovery is limited to "the harm occasioned by" the fabrication), the existence of probable cause based on non-fabricated evidence ceases to be a defense for the fabricator.

      My review of the record in this case leads me to conclude that Mitchell has no such claim. The threadbare record before me at oral argument appeared to support a claim that the law enforcement authorities had cajoled a witness who had described someone else as the perpetrator to identify Mitchell instead, and then, after an effective cross-examination based on a

police report, manufactured another report to prop up her testimony. However, the grand jury minutes make it clear that LD identified Mitchell as her attacker from the outset, and that the belatedly disclosed report was in fact the "scratch copy" of the report that had been disclosed prior to trial. Though it is clear that transcription errors were made in preparing the computer-generated report, the specter that this case embraced conduct analogous to the conduct at issue in *Jocks* and *Ricciuti* has been dispelled by the grand jury and trial transcripts.

In light of the foregoing, I find it appropriate to convert the defendants' motion to dismiss the false arrest and malicious prosecution claims into a motion for summary judgment. When matters outside the pleadings are presented in connection with a motion to dismiss, "a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (internal quotation marks omitted). The Second Circuit permits conversion of a motion to dismiss into a motion for summary judgment provided the non-moving party has had "reasonable opportunity to meet facts outside the pleadings." *In re G. & A. Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985). Here, Mitchell received a Rule 56.2 statement[9] from the defendants and both parties reference materials beyond the scope of the pleadings by submitting exhibits and discussing the trial testimony. I therefore deem it appropriate to consider the motion as a motion for summary judgment. Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). If Mitchell wishes to oppose the motion for summary judgment, he may do so in writing on or before February 23, 2009.

---

[9] To further ensure that Mitchell is aware of his obligations in opposing a motion for summary judgment, an additional copy of the defendants' Rule 56.2 statement will be forwarded to Mitchell with a copy of this opinion.

CONCLUSION

For the reasons stated above, the defendants' motion on the pleadings is granted in part and denied in part. Specifically, it is denied with respect to Mitchell's claims of false arrest and malicious prosecution. As to those claims, I am converting the motion into a motion for summary judgment, and Mitchell shall file any supplemental opposition to the converted motion on or before February 23, 2009.[10] Defendants' reply, if any, shall be filed and served on or before March 2, 2009.

So ordered.


John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
       January 23, 2009

---

[10] At the time of oral argument, I expressed the view that it was appropriate to appoint counsel for Mitchell to pursue claims based on *Ricciuti* and *Jocks*. Having now reviewed the grand jury minutes and the transcript of the first trial, I no longer hold that view and thus decline to appoint counsel.